IN THE UNITED STATES DISTRICT COURT

FOR THE STATE OF ALASKA AT ANCHORAGE

---oOo---

AMERICAN CIVIL CONSTRUCTORS )
WEST COAST, INC. and MRC )
HOLDINGS, INC. f/k/a HURLEN )
CONSTRUCTION COMPANY, )
 )
       Plaintiffs, )
 )
    vs. ) NO. A05-153 CV (JWS)
 )
ZURICK AMERICAN INSURANCE )
COMPANY and TRAVELERS )
INDEMNITY COMPANY OF AMERICA )
CASUALTY COMPANY, )
 )
       Defendants. )
 )
_____)

---oOo---

DEPOSITION OF DEVENEY TOTTEN

Monday, October 24, 2005

---oOo---

*Certified Copy*

REPORTED BY: LISA P. GALLI, CSR NO. 12351

PROFESSIONAL REPORTING SERVICES (800) 261-4814

1  for Travelers. And then in 1991 I went to work for
2  Nationwide Wausau Insurance. And in 1992 I started
3  handling the CD, construction defect, there.
4      Q.   And the Walnut Creek office, is that only an
5  office for construction defect claims?
6      A.   No.
7      Q.   The territory you cover is the Northwest?
8      A.   Are you asking about the office, or me
9  specifically?
10     Q.   The construction defect claim component of the
11 office.
12     A.   Yes, that would be correct, then.
13     Q.   And what states does that include?
14     A.   Washington, Alaska, Idaho, Montana, Colorado;
15 I believe that's it.
16     Q.   And who is your immediate supervisor at
17 Travelers?
18     A.   Tom Judge.
19     Q.   The -- it's fair to say, then, you're an
20 experienced claims investigator of construction defect
21 claims?
22     A.   Yes.
23     Q.   Are you familiar with the obligations of
24 Travelers to investigate claims submitted by its
25 policyholders?

1   A. Yes.
2   Q. And that includes an obligation to complete a
3   prompt and thorough investigation of a claim?
4   A. Yes.
5   Q. In doing that, you are to place the interest
6   of the insured at least on equal footing with the
7   interests of the folks that write your paycheck?
8   A. Yes.
9   Q. And you are to consider all possible bases for
10  which an insured may be provided coverage under a
11  policy?
12  A. Yes.
13  Q. And you are to disclose any basis for coverage
14  that you discover to the insured?
15  A. Yes.
16  Q. And in the investigation into the facts, if
17  you need additional information, you don't hesitate to
18  request that information from the insured?
19  A. Yes.
20  Q. Or from third parties, if needed?
21  A. Correct.
22      MR. CHANDLER: I'm going to show you
23  Exhibit 1.
24      Off the record.
25      (Whereupon a discussion was held off the record.)

DEPOSITION OF DEVENEY TOTTEN                                    9

1           MR. CHANDLER:  Q.  Going back to kind of the
2    general obligations you bring to your job as a claims
3    investigator, Ms. Totten.
4           Do you agree that once a claim is submitted to
5    you, that if you determine any possibility for coverage
6    exists to defend a claim, Travelers is to provide a
7    defense even if it does so under a reservation of
8    rights?
9           MR. YOUNG:  Object to the form of the
10   question.  Calls for a legal conclusion.
11          THE WITNESS:  You need to rephrase the
12   question, please.
13          MR. CHANDLER:  Q.  Are you familiar with the
14   concept of providing a defense under a reservation of
15   rights?
16      A.   Yes, I am.
17      Q.   Are you, as a senior technical specialist, one
18   of the persons in Travelers that makes a decision
19   whether a defense would be provided under a reservation
20   of rights?
21      A.   Yes.
22      Q.   And do you have an understanding of when it is
23   appropriate for Travelers to provide a defense under a
24   reservation of rights?
25      A.   Yes.

DEPOSITION OF DEVENEY TOTTEN                               10

1   Q. And what is your understanding?

2   A. If we have questions about coverage, we send a
3   reservation of rights letter; we cite the language that
4   we think is relevant, and we advise the insured that we
5   are defending under reservation of rights.

6   Q. And what is the analysis you make, in general,
7   when deciding whether a claim will be defended under a
8   reservation of rights?

9   A. I determine if there's a possibility of
10  coverage, and I just go through all the coverage, look
11  at the policy, look at the claims being made, whatever
12  facts I need to get, and then I determine whether or not
13  there is a potential of coverage under the policy. And
14  if we decide to defend, then I issue a reservation of
15  rights.

16  Q. So that decision depends whether there is a
17  potential for coverage?

18  A. Yes.

19  Q. And if you, as a senior technical analyst,
20  decide there is no potential for coverage, that's when
21  you issue a denial letter?

22  A. I make that recommendation.

23  Q. Going back to Exhibit 1, I think you had a
24  chance to look at this when we were off record.
25      Can you tell us what that document is?

DEPOSITION OF DEVENEY TOTTEN                    11

```
 1      A.   That's the date on the Acord form, yes.
 2      Q.   What is the date on this form for the time of
 3 occurrence?
 4      A.   June 1st, 2002.
 5      Q.   This claim was eventually assigned to you to
 6 investigate?
 7      A.   Yes.
 8           MR. CHANDLER:  I will show you Exhibit 2.
 9           MR. PEASE:  Brooks, do have a date on this
10 one?
11           MR. CHANDLER:  We can go off the record for a
12 second.
13      (Whereupon a discussion was held off the record.)
14           MR. CHANDLER:  Q.  Ms. Totten, I will
15 represent to you that Exhibit 2 is an excerpt from a
16 pleading dated December 17th, 2004 entitled "Answer and
17 Second Amended Complaint by the City of Homer."
18           Did you review and investigate the claims
19 identified in Exhibit 2 being made by the City of Homer?
20      A.   Yes.
21      Q.   And in particular, did you determine the
22 allegation made by -- allegations made by Homer included
23 an allegation that Hurlen failed to properly perform
24 corrosive coating on the pilings supporting a dock?
25      A.   Could you repeat that again?
```

DEPOSITION OF DEVENEY TOTTEN                              13

1   Q.   Sure.
         Did Homer make a claim that Hurlen failed to
3   properly perform corrosive protection work --
4   A.   Yes.
5   Q.   -- on pilings supporting the dock?
6   A.   Yes.
7   Q.   Did you also review the allegations referenced
8   against American Civil Constructors West Coast, Inc., in
9   paragraphs 53 through 60 of Exhibit 2?
10  A.   Will you repeat the question?
11  Q.   In the course of your investigation of the
12  claims identified on page 1 of Exhibit 2, did you refer
13  to the allegations made in paragraphs 53 through 60 of
14  Exhibit 2, also?
15  A.   I looked at them, yes.
16  Q.   And did you consider those allegations to
17  amplify or provide any detail with regard to the
18  allegation in paragraph 50 directed against Hurlen?
19  A.   I don't recall.
20  Q.   And I assume you're satisfied that you
21  thoroughly investigated whether the allegations within
22  paragraphs 48 through 52 were possibly covered under any
23  Travelers' policy issued to Hurlen?
24  A.   Yes.
25  Q.   And in the course of that investigation, did

1  you conclude that the allegations in Exhibit 2
2  constituted a claim for property damage as defined in
3  the Travelers' policy?
4      A.   I concluded this was a claim for property
5  damage.
6      Q.   Before we go further, I will just let you know
7  that the policy -- a policy is available and marked as
8  Exhibit 3.
9           If you could take a moment and review
10 Exhibit 3, briefly.
11     A.   Is there a certain section you want me to look
12 over?  It would take me a long time to read it over in
13 its entirety.
14     Q.   I'll ask some introductory questions, then.
15          I'll represent to you that Exhibit 3 is taken
16 from a commercial general liabilities contractors
17 coverage form issued by Travelers insuring Hurlen.
18          MR. PEASE:  Do you know which year?
19          MR. CHANDLER:  Yes, it would be the 2000 to
20 2001 policy year.
21          MR. YOUNG:  2000 to 2001?
22          MR. PEASE:  6/1/01 to 6/1/02?
23          MR. CHANDLER:  Yeah.
24     Q.   I assume you're familiar with this coverage
25 form?

DEPOSITION OF DEVENEY TOTTEN                              15

1  A.  Yes.

2  Q.  It is a coverage form specific to general
3  liability coverage for contractors?

4  A.  I believe so, yes.

5  Q.  And during the investigation of Homer's
6  claims, did you conclude that the allegation for
7  property damage met the definition for property damage
8  as set forth in Exhibit 3?

9  A.  Yes, I think it met the definition for
10 property damage.

11 Q.  And did you, in the course of your
12 investigation, conclude that the property damage alleged
13 in Exhibit 2 was potentially the result of an occurrence
14 as defined in the policy marked as Exhibit 3?

15 A.  Yes.

16 Q.  And in the course of your investigation, did
17 you conclude that the occurrence resulting in a property
18 damage potentially occurred within one of several of the
19 policy years in which Hurlen was insured by Travelers
20 between June 1st of 19- -- June 1st of 2000 and June 7th
21 of 2002?

22 A.  Did I conclude the occurrence took place?

23 Q.  That the occurrence potentially occurred
24 within one of those policy years.

25 A.  Yes.

1    A.   Yes, I did.

2    Q.   Did you consider this letter from Homer to

3  Hurlen to have any significance with regard to your

4  coverage investigation?

5    A.   Yes, I did.

6    Q.   What was the significance of it?

7    A.   That a portion of the deck was -- dock was now

8  allowed to be used, so it could be used as it was

9  intended to be used as a dock as of this date.

10   Q.   And did you reach any conclusion as to whether

11 the portion of the dock referenced in Exhibit 8, as of

12 February 4, 2002, now fell within the products completed

13 operation hazard as defined in the policy?

14   A.   I considered it.

15        What time are you talking about a conclusion?

16 At the time I saw this?

17   Q.   Before sending the May 27th, 2005, denial

18 letter that's Exhibit 5.

19   A.   And the question is, did I reach any

20 conclusion?

21   Q.   Yes.  Did you reach any conclusion as to

22 whether the City of Homer's acceptance of the portion of

23 the dock placed that portion within the completed --

24 products completed operation hazard of the policy for

25 coverage purposes?

DEPOSITION OF DEVENEY TOTTEN                          37

1    A.    I thought it might, yes.

2    Q.    And did you ever go -- reach any more

3 definitive conclusion than that before May 27th?

4    A.    I think I felt it was a possibility that it

5 would fall within the completed, products completed

6 operations, that portion that was used.

7    Q.    And if so, then there is a possibility that a

8 coverage analysis would have to be made using that

9 section of the policy?

10    A.    All of this was considered before the letter

11 was written.  We made a coverage analysis.  It's

12 contained in the letter.

13    Q.    If you could look at Exhibit 3, the bottom of

14 page 13 and the top of page 14, which has the projects

15 completed operations hazard, Definition No. 14.

16    A.    Uh-huh.

17    Q.    You're very familiar with that definition, I

18 assume, given your work?

19    A.    I'm familiar with it, yes.

20    Q.    Have you often had to apply it in claims

21 investigation of construction defect claims?

22    A.    I have.

23    Q.    Section 14-C of this definition specifically

24 refers to part of the work being put to its intended

25 use, correct?

DEPOSITION OF DEVENEY TOTTEN                    38

1  Q.  And based on your experience as a claims
2  investigator, if you had concluded that Calvert and
3  Theriault had met the definition of subcontractor, the
4  damage to your Work Exclusion J would not have applied
5  to work within the completed operations hazard, correct?
6  A.  If I had concluded that Theriault was a
7  subcontractor to Hurlen, Calvert was a subcontractor --
8  was a subcontractor to Hurlen, then Exclusion J wouldn't
9  apply, or they will fall within the subcontractors.
10    I would like to correct that.
11    They would fall within the second paragraph of
12  Exclusion J.
13  Q.  And am I correct in understanding your
14  testimony that if you had in your file proof that the
15  dock had actually been used after Homer took beneficial
16  occupancy in February of 2002, you would have concluded
17  that it met the definition of 14-C for products
18  completed operations hazard?
19    MR. YOUNG:  Object to the form of the
20  question.  Misstates her testimony.
21    Go ahead and answer it, if you can.
22    THE WITNESS:  If a portion of the dock was put
23  to its intended use, that portion of the dock would
24  likely fall within the products completed operations
25  definition, that portion.

DEPOSITION OF DEVENEY TOTTEN                     45

```
 1          MR. CHANDLER:  Q.  And is it your testimony
 2   that that requires proof of actual use rather than
 3   acceptance of beneficial occupancy by the owner?
 4        A.   The beneficial occupancy may be satisfactory;
 5   I'm not sure.  I'm not sure what we considered or
 6   exactly what documents we looked at.
 7        Q.   If you could look at Exhibit, 5, the questions
 8   I'm going to ask cover the bottom of page 5 and top of
 9   page 6.
10             What evidence formed the basis for your
11   conclusion mentioned at the top of page 6 that Hurlen
12   knew of improperly coated piles by September of 2001?
13        A.   There was correspondence about the pile
14   coating.
15        Q.   Handing you Exhibit 7.  Exhibit 7 is dated
16   October 16th, 2001; it references September
17   correspondence and mentions defective touch-up paint,
18   correct?
19        A.   Mentions defective -- yes.
20        Q.   Is the defective touch-up paint what you
21   intended to refer to at the bottom of page 5, top of
22   page 6 with regard to improperly coated piles?
23        A.   Would you repeat the question.
24        Q.   Is the defective touch-up paint the
25   improperly -- is what you meant by your reference to
```